---

## JAPITAL TRACTION COMPANY *v.* APPLE.*

---

STREET RAILROADS; PROXIMATE CAUSE; QUESTIONS FOR THE JURY; NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE; STREETS AND HIGHWAYS.

1. If a street railway car while being run at an unlawful rate of speed along a city street strikes and kills a pedestrian crossing the tracks, the question whether the excessive speed was the proximate cause of the injury is a question of fact for the jury.

2. Failure of a pedestrian to stop, look, and listen before crossing the tracks of an electric railway in a city street does not show contributory negligence as a matter of law. (Following *Capital Traction Co.* v. *Lusby*, 12 App. D. C. 295, and *City & Suburban R. Co.* v. *Cooper*, 32 App. D. C. 550.)

3. If, in a personal injury case, the jury can fairly find from the evi-

---

*Street Railroads.*—As to right of motorman to assume that person on track will get out of way, see note to *Riley* v. *Consolidated R. Co.* 21 L.R.A.(N.S.) 880; as to right of motorman to assume that no one will attempt to cross the track so close in front of the car as to render a collision probable, see note to *Bresee* v. *Los Angeles Traction Co.* 5 L.R.A. (N.S.) 1059; as to violation of ordinances relating to street railroads as ground for private action, see note to *Sluder* v. *St. Louis Transit Co.* 5 L.R.A.(N.S.) 247; on the question of operating street car at speed in excess of that prescribed by ordinance as negligence or evidence of negligence, see note to *Ford* v. *Paducah City R. Co.* 8 L.R.A.(N.S.) 1093.

dence that, without contributory negligence on the part of the injured person, the neglect of a statutory duty—such as the running of a street railway car at an unlawful rate of speed—was the proximate cause of the injury, negligence exists as a matter of law. (Following *Clements* v. *Potomac Electric Power Co.* 26 App. D. C. 482, and *City & Suburban R. Co.* v. *Cooper*, supra.)

4. Those in control of street railway cars are under a duty to exercise ordinary care to avoid injuring pedestrians crossing the tracks; and pedestrians must exercise a like care in looking out for approaching cars, and must not recklessly expose themselves to danger. No fixed rule can be laid down for the government of every case that arises. What is due care must depend upon the circumstances of the particular case.

5. If a pedestrian about to cross a street car track sees an approaching car some distance away, and the conditions are such that an ordinarily prudent person might reasonably believe that he could cross in safety, the act of crossing is not negligence; but if, under such circumstances, the car is proceeding at a lawful rate of speed, and the driver, when he sees the pedestrian is in danger, makes a reasonable effort to avoid running over him, the company will not be liable if the pedestrian is struck and injured, as no negligence is shown.

6. One about to cross a street car track—at least in the absence of circumstances sufficient to indicate the contrary—has the right to assume that an approaching car is not exceeding, and will not exceed, the rate of speed limited by municipal ordinances. Following *Metropolitan R. Co.* v. *Hammett*, 13 App. D. C. 370, and *City & Suburban R. Co.* v. *Cooper*, supra.)

7. Aside from the duty imposed by law not to exceed a certain rate of speed, it is the duty of one in control of a street railway car to keep a diligent lookout ahead so that the car may be stopped in time, if possible, to avoid injury to a pedestrian crossing the track.

8. If the motorman of an electric street railway car sees the dangerous situation of a pedestrian attempting to cross the track in front of the car, in time to avoid injuring him by the use of ordinary care, the company is liable if the pedestrian is struck and injured, notwithstanding he also is guilty of negligence. Following *Capital Traction Co.* v. *Divver*, 33 App. D. C. 332.)

9. A street railway company has no exclusive right to the use of the parts of the streets occupied by its tracks; but the company and the public using the streets must exercise their respective rights with due regard to the rights of each other, exercising reasonable care under the circumstances of each particular case. (Following *Ecking-*

*ton & S. H. R. Co.* v. *Hunter,* 6 App. D. C. 287, and *City & Suburban R. Co.* v. *Cooper,* 32 App. D. C. 550.)

10. While the motorman of an electric street railway car running at a lawful rate of speed may have the right to reasonably assume that a person on or near the track will get out of the way, it is his duty to have his car under ready control so that it may be readily stopped if danger is found to be imminent. (Following *McDermott* v. *Severe,* 25 App. D. C. 276.) And this principle applies in the case of adults as well as children.

11. It is the duty of a motorman of an electric street railway car going down the steep grade of a city street to restrain his car within the lawful rate of speed whether anyone can be seen on the track or not, and especially is it his duty to reduce his speed if he sees a person about to cross the track who will be able to do so in safety if the speed is not greater than the law permits.

No. 2080. Submitted February 15, 1910. Decided March 3, 1910.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia on verdict in an action to recover damages for the alleged negligent killing of the plaintiff's intestate.                    · *Affirmed.*

The COURT in the opinion stated the facts as follows:

This action was brought by the administrator, Theodore T. Apple, to recover damages for an act of negligence by the Capital Traction Company resulting in the death of his intestate, Hugh L. Apple.

The testimony on behalf of the plaintiff tended to show the following facts: Hugh L. Apple was about thirty-six years old on December 24th, 1906, and lived at 1468 Chapin street. His family consisted of his sister and a daughter, who was then nine years of age. He had charge of the circulation of the Washington Post in that section, and was earning $100 per month. That afternoon, about 5 o'clock, he started from a point on Pennsylvania avenue, on his way home, in a car of defendant, which went up 14th street. He had a package of periodicals under his arm, and seemed to be dozing while sitting in the car. He did not stop the car at Chapin street

crossing, but was put off at Clifton street, on the east side of 14th, which is 55 feet wide from curb to curb. Clifton, Chapin, and Belmont streets, which intersect 14th, are 30 feet wide. The distance between the south line of Clifton and the north line of Chapin is 347 feet 6 inches. From the south curb of Chapin to the north curb of Belmont it is 357 feet. There is an electric light on the west side of 14th street, between Clifton and Chapin streets, 183 feet and 6 inches from Clifton.

After getting off the car, Apple walked diagonally across 14th street towards Chapin street. At a point opposite the electric light aforesaid, he was struck by a southbound car on the western track. He was walking slowly, but seemed to step hurriedly as he was about to pass the west rail of the track. He was struck by the end of the car as it passed, and then thrown a considerable distance. He was taken into a nearby drug store, and from thence to the Garfield Hospital, where he died within two days, without regaining consciousness. There is a very steep incline in 14th street, from a little north of Euclid street, which is next to Clifton, to Florida avenue, which is the next street south of Belmont. The train of two cars which struck Apple was coming down 14th street at an unusually rapid rate,—double the ordinary speed according to most witnesses, and estimated at 30 miles per hour. The north-bound car, from which Apple alighted, was going slowly up grade, and met the south-bound train between Euclid and Clifton streets. Some person was standing at Clifton street apparently waiting to take the south-bound cars, which, however, did not stop. The sound of a gong or bell was not heard by witnesses, whose attention was attracted by the unusual speed of the train.

One witness, who was standing on the west side of 14th street and just north of Chapin, first saw Apple as he was stepping on the eastern track. He made a slight pause and started diagonally across. The coming car was then on the north side of Clifton street. The side of the car struck him; heard no gong sounded. It was not stopped until it got down about half way between Belmont street and Florida avenue; noticed no slackening of speed before the man was struck; did not realize the speed of the car until it passed. The police regulation limiting the speed of street cars to 15 miles per hour

in streets, and 6 miles an hour at crossings, was offered in evidence.

The defendant offered a police regulation giving the right of way to street cars, and declaring that no person shall obstruct or delay their movements at the lawful rate of speed. It read also from sec. 18 of the act of May 18, 1862, incorporating the Washington and Georgetown Railroad Company, giving free and uninterrupted use of its roadway, and prescribing a penalty for obstructions and delays. A similar provision was read from the act incorporating the Rock Creek Railway Company, and it was admitted that the defendant is a consolidation of said companies. Evidence was introduced tending to show that Apple on the afternoon in question was apparently under the influence of intoxicants; that his drowsiness proceeded therefrom; that he vomited partly in the car and on the platform; that he was helped off the car by the conductor; and that in his vomit at the hospital the odor of alcohol was detected. The motorman of the south-bound train testified that he met the other train north of Clifton street; he was running about 12 miles an hour, had no current on, was "drifting down the hill;" saw the deceased walking slowly across the eastern track, and "kind of stopped on the eastern track as the bell was rung at him;" thought he had intended to wait for the car to pass, "so I did not make much more effort to stop the car;" "when I got about up to the man, or close to him, he walked very slowly across the track in front of the car, and before I could get it stopped, why, the car hit him;" does not remember whether he stopped car before reaching Chapin street or not; "when I saw the man walk up to the track I began to put the brakes on;" was ringing the bell when he walked on the track; when first seen he was not on the track; "he walked up a little piece, and then I began to put on the brakes; when he looked up towards me I thought he had seen the car and intended to wait; looked like he was going to stop and wait for the car to pass; I did not make much more effort to stop the car; had the brakes taken up, but I let the car go ahead again;" "when he stopped and looked up he was in a position where

the car could have passed without striking him;" "released the brake when I thought man would stop;" he put on emergency brake and reversed the current when the man walked in front of the car. On cross-examination he said that his train was on schedule time; some other cars that ought to have preceded him had not done so; there should have been two minutes between him and train in front, but instead there were twelve minutes between him and his leader. Some other evidence tended to show that the train was not running extra fast; that the bell was ringing all the way down the hill; that the brakes were put on about the time the man was struck; and that he was seen to pause and look when on the eastern track, before proceeding on to the western one. Plaintiff's evidence in chief and rebuttal tended to show that deceased was a sober man, and appeared sober to the dealer from whom he purchased his periodicals, when he started home; that his newspaper occupation kept him up at night; and that there was no odor of alcohol in his breath when in the drug store after his injury. The defendant asked the court to direct a verdict, which was refused. At the request of plaintiff, the court instructed the jury that if the car was being operated at a greater speed than the regulation permitted, the defendant was guilty of negligence; and that deceased had a right to presume that the car was not being run, and would not be run, at an illegal rate of speed.

Many instructions were requested by the defendant, all of which were refused. The first of these was that there could be no recovery, if the motorman wilfully ran over the deceased. The effect of the second was that defendant had the right of way on its tracks, and it was the duty of plaintiff's intestate not to go upon the same, when it was about to be occupied, and if hurt in violating that duty there could be no recovery. The effect of the third was that the plaintiff's intestate, before proceeding to cross the track, was bound to carefully look and listen to ascertain if the car was approaching; and any excessive speed, or failure to ring the bell, if such there was, would not excuse the intestate from the exercise of said precaution; if

he failed to carefully look and listen there can be no recovery. The next two instructions presented the same proposition in slightly different forms. The next was to the effect that if intestate was in a safe position, from which he saw the car coming, and concluded he might cross in safety, but failed in his experiment, there can be no recovery. Another was to the effect that if the gong was sounded by the motorman as soon as he saw the intestate walking towards the track, and if, at the time, intestate could have avoided the danger by halting, if not on the track, or by stepping to right or left, if already upon it, the motorman, as a matter of law, had the right to presume that he either knew the danger, or would discover it in time to avoid it, and was in possession of his senses; and it was not his duty to decrease the speed of his car until he saw that intestate persisted in trying to cross the track. The next was similar to the last. Another was to the effect that, before recovery can be had, plaintiff must show that his intestate was in a position of peril from which he could not reasonably extricate himself; that the motorman had knowledge of it in time to avoid collision, and failed to exercise proper care thereafter. Another was to the effect that, if the plaintiff's intestate voluntarily placed himself in danger from which he had means of escape, and continued therein without precaution to escape, there can be no recovery. The next two present the necessity of looking and listening before crossing a track, in a slightly different form from preceding ones. Three more present the question of the motorman's right to presume that the party would not walk on the track, if he saw the car, etc. Another was a substantial repetition of a former one, relating to the party taking the chances of crossing before the car. Another was that, if intestate was intoxicated and was thereby made to neglect ordinary care, there could be no recovery. Another related to intestate's knowledge of the situation, the speed of the cars, and directed the jury to take it into consideration. The last relates to the burden of proof, preponderance of evidence, and duty of the jury to discriminate between witnesses, etc.

The court submitted it to the jury to find whether or not defendant was guilty of negligence in running the car at the time of the accident; and to answer specially whether the plaintiff's intestate had been guilty of contributory negligence. In the event that they found that he was guilty of contributory negligence, they were directed to find whether or not, after discovering the danger thus caused, the defendant could have avoided the injury by the exercise of sufficient care. The jury found specially that he was not guilty of contributory negligence, and returned a verdict for plaintiff for the sum of $5,000. Judgment was entered thereon,—after motion for a new trial was overruled; and the defendant appealed.

*Mr. R. Ross Perry, Mr. R. Ross Perry, Jr.,* and *Mr. G. Thomas Dunlop* for the appellant.

*Mr. A. E. L. Leckie, Mr. Creed M. Fulton,* and *Mr. J. W. Cox* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. We are of the opinion that it was not error to refuse to direct the jury to find for the defendant, and shall not consume time with a review of the evidence. If the defendant's car was being run at an unlawful rate of speed it was for the jury to say whether that was the proximate cause of the injury. That plaintiff's intestate did not stop, look, and listen before crossing the track in a city street would not warrant the conclusion of contributory negligence as a matter of law. *City & Suburban R. Co.* v. *Cooper,* 32 App. D. C. 550–557; *Capital Traction Co.* v. *Lusby,* 12 App. D. C. 295–302; *Consolidated Traction Co.* v. *Haight,* 59 N. J. L. 577–581, 37 Atl. 135; *Marden* v. *Portsmouth, K. & Y. Street R. Co.* 100 Me. 41–47, 69 L.R.A. 300, 109 Am. St. Rep. 476, 60 Atl. 530.

2. In stating the case, we have given the substance of the

defendant's refused instructions, on each of which error has been assigned. They are too lengthy and numerous to be set out in full.

The learned trial justice, refusing the instructions generally, undertook to embrace in his charge all of the law applicable to the facts of the case. He embodied some of the propositions contained in the refused instructions, stating some differently and qualifying others. Some were altogether ignored.

Having given the first instruction asked by the plaintiff, relating to the unlawful speed of the car as constituting negligence, the court elaborated the same, telling the jury that if they found the car was being run at a greater rate of speed than 15 miles per hour, and by reason thereof struck the plaintiff while lawfully and properly crossing the track, defendant would be negligent, as a matter of law, and liable; if not running with unlawful speed, it would not be liable. There was no error in this. It is the settled doctrine of this Court that if the jury can fairly find from the evidence that, without contributory negligence on the part of the injured person, the neglect of a statutory duty was the proximate cause of the injury, negligence exists as a matter of law. *Clements v. Potomac Electric Power Co.* 26 App. D. C. 482–500, and cases there cited; *City & Suburban R. Co. v. Cooper,* 32 App. D. C. 550–555.

3. The court next took up the question of the contributory negligence of plaintiff's intestate, and the jury were plainly told that, notwithstanding the defendant may have been negligent, the plaintiff could not recover therefor, if his intestate failed to exercise the care of an ordinarily prudent man at the time, and thereby helped to cause the accident. It was further charged as follows: "He was bound to conduct himself as a careful, prudent man in the circumstances. It was his duty not to put himself unnecessarily in a position of danger. If he did voluntary do so, or carelessly do so, then the result is be attributed to his careless act. Was he careless? First, did he see the car before it was just upon him? When he started to cross the track, did he know that a car was coming? There

is evidence that has been freely commented on here that he paused and looked up the track in the direction of this approaching car. Did he see it? If he did, where was it when he saw it? That is a question of fact for you. Where was it? How fast was it coming at that time? And how fast was it appearing to him to be coming at that time? He was bound to look at it as a reasonable and prudent man in his circumstances. Now was it so far away, and did it appear to him, and reasonably appear to him, to be coming at such a rate that he had ample time to go across, so that any reasonably careful and prudent man would go across, thinking he was perfectly safe in doing so? Or, was it so near to him, and coming at such a rate, that any ordinarily prudent and careful man would say: 'I must stop; I must not try to cross now; the car will be past in a moment.' Which was the situation?" The jury were further told to consider the evidence relating to the party's intoxication; it might help to explain how the accident happened; but if intoxicated, the fact would not prevent his being responsible, like a sober man, for his want of care.

The court then further proceeded as follows:

"Treating him as a sober man, in the possession of his faculties as a sober man, and looking up that track, put yourself right in the position in which he was. Consider how far off the car was; how far he needed to step to be across the track; and remember, as you have a right to do and are bound to, that the lawful rate of speed there was 15 miles an hour. He had a right to take notice of that fact,—that the lawful rate of speed was 15 miles an hour; and he had a right to take it for granted that it was not more than 15 miles an hour (that is, that the car was not approaching him at a greater rate of speed than 15 miles an hour), unless he saw that it was,—unless he saw that the circumstances were such that, as a reasonable man, as a prudent and careful man, he ought to have noticed that it was coming faster than that. You will probably be able, when you think the evidence all over, to put yourself right in the position in which he was, and ask yourself the question whether, as a prudent, careful, sober man, standing in the position where

he stood when he first saw the car, when he first attempted to cross, he was acting the part of a careful and prudent man in attempting to go over the track. If he was not, then that is the end of the case, and the defendant is entitled to a verdict.

"Suppose he did not see the car. Suppose he did not look to see whether a car was coming or not. That would be negligence, as a matter of law, on his part. It was his duty to look. The track there itself was a signal and a notice to him that cars were passing there every now and then. He knew that, of course; and the law charged him with knowledge that a train was liable to be passing there at almost any time. . So that it was his legal duty to look and listen before he attempted to go over the track. So that if you find he did not look, and did not take any pains to look and notice whether a car was coming or not, that was an act of carelessness on his part; and if that was why he was struck, if that partly contributed to the accident, then neither he nor his representative could recover against the defendant.

"But, as I say, the case has been put on the theory that he did look up, and did see. Both sides have argued the case on that theory; and I dwell more particularly upon that phase of the case, and so come back to the point again: When he did look up and see the car, where was it? How fast did it appear to him to be coming? As a reasonable, sober, prudent man, looking in that direction and seeing the car, was there anything about it to make him think that it was moving faster than 15 miles an hour? If so, then he was bound to act according to the dictates of care and prudence with reference to that fact. But if there was not anything to indicate to him as a reasonable and prudent man that it was coming faster than the lawful rate of speed, and he attempted to go over the track, was he careless in doing so?"

It is common knowledge that the conditions attending the operation of ordinary steam railways across country highways, and even city streets, and those attending the running of electric cars along the streets of an ordinary city, are essentially different. The former run at considerable intervals, have much longer and heavier trains, and are not easily brought to a stop.

The latter run with frequency,—car following car in rapid succession,—are always in more or less crowded streets, and can be stopped quickly. The exigencies of daily traffic, and the needs and conveniences of individuals, result in constant crossing of street railway tracks both at and between street crossings. Knowing this, those engaged in running the street cars are under a duty to exercise ordinary care to prevent running over vehicles and pedestrians. These latter must also exercise due care in looking out for coming cars, and must not recklessly expose themselves to danger. No fixed rule can be laid down for the government of every case that arises. What is due care must depend upon the circumstances of the particular case. Surely, one seeing a car coming a considerable distance away is not bound to stop and wait for it to pass. If such were the rule one could rarely cross a street, without being guilty of negligence, where cars follow each other at short intervals. If one sees a car very near and takes the mere chance of crossing ahead of it, and fails in his calculation, he may well be held to be the victim of his own carelessness. But if the car is some distance away, and the conditions are such that an ordinarily prudent person might reasonably believe that he could cross in safety, the act of crossing would not be negligence. *McQuisten v. Detroit Citizens' Street R. Co.* 147 Mich. 67–69, 110 N. W. 118; *Ryan v. Detroit Citizens' Street R. Co.* 123 Mich. 597–598, 82 N. W. 278; *Detroit United R. Co. v. Nichols,* 91 C. C. A. 257–264, 165 Fed. 289. If, however, in such a case, the car is proceeding within the lawful rate of speed, and the driver, when he sees that the crossing party is in danger, makes a reasonable effort to avoid running over him, the car company would not be liable for negligence. There could be no recovery because of the absence of negligence on the part of the defendant.

One about to cross a street car track, in the absence of circumstances sufficient to indicate the contrary at least, has the right to assume that it [an approaching car] is not exceeding, and will not excede the rate of speed limited by the municipal ordinances. *City & Suburban R. Co. v. Cooper,* 32 App. D. C.

550–557; *Metropolitan R. Co.* v. *Hammett,* 13 App. D. C. 370–379; *Chunn* v. *City & Suburban R. Co.* 207 U. S. 302–309, 52 L. ed. 219–222, 28 Sup. Ct. Rep. 63.

Of course if the party saw, or ought to have observed, under the circumstances, that the car was moving with excessive speed, ordinary prudence would require him to be more cautious; and the jury were so told. Aside from the duty imposed by law not to exceed a certain rate of speed, it is the duty of the car operator to keep a diligent lookout ahead so that the car may be stopped in time, if possible, to avoid injury to one who may be crossing ahead of him. *Baltimore Traction Co.* v. *Helms,* 84 Md. 515–526, 36 L.R.A. 215, 36 Atl. 119; *New Jersey Electric R. Co.* v. *Miller,* 59 N. J. L. 423–425, 36 Atl. 885, 39 Atl. 645. If, as the testimony tends to show, another step would have carried plaintiff's intestate to a place of safety, then it is not unreasonable to believe that, if the car was running at double the lawful and usual rate of speed, his injury was attributable to that fact alone. It was properly left to the jury to determine whether the car was moving with excessive speed, and whether the plaintiff's intestate ought reasonably, under all the circumstances, to have known that such was the case. *United R. & Electric Co.* v. *Watkins,* 102 Md. 264–269, 62 Atl. 234; *New Jersey Electric R. Co.* v. *Miller,* supra.

4. In the event that they should find that plaintiff's intestate was guilty of contributory negligence, the jury were charged to inquire whether, notwithstanding such negligence, the motorman, after seeing his imminent danger, could have prevented the injury by the exercise of due care. And they were charged that if the motorman saw the dangerous situation of plaintiff's intestate in time to have averted it by the use of ordinary care, the plaintiff would nevertheless be entitled to recover. The law was correctly stated. *Capital Traction Co.* v. *Divver,* 33 App. D. C. 332–336. We have only given the substance of this charge, because the question is of no practical importance inasmuch as the jury expressly found that there was no contributory negligence. Moreover, the charge, as

given, is not substantially different from the instruction asked by the defendant.

5. As bearing on the question of negligence on the one hand, and contributory negligence on the other, and in view of special instructions asked by defendant, it is necessary to consider another part of the charge. The paragraph referred to reads as follows:

"It has been said, and it is true, that the defendant company had the right of way over its tracks. It had the first right to occupy those tracks, provided it was occupying them in a lawful way. It had the superior right as between the defendant company and the decedent. When the time came for the car to move down there, it had the right to move along there, and it was the decedent's duty to keep off and let the car pass. It was his duty not to interfere with it in any way. But that assumes that the car was moving at a lawful rate of speed. It does not mean that the defendant company had a right to run cars down there at the rate of 30 miles an hour, as some of the evidence has tended to show that this car did. It had not a superior right to the use of the track for that purpose. But if it was operating within the law, then the superior right was the right of the defendant.

"On the other hand, the decedent had a right to cross the track under proper limitations. He could not get to his home without crossing it, apparently; he was on the other side of it, so that he had a perfect right to go across there if he went across as a careful and prudent man would, with due regard to the superior right of the defendant to use the track in a lawful way. You see, both of these parties, accordingly, had a right to occupy that street with certain limitations, each conducting himself lawfully and properly. That is to say, in other words, the fact that this was not a regular street crossing does not of itself prevent the plaintiff from recovering."

We are of the opinion that the court did not err in this charge, or in refusing the special instructions on the point that were prayed by the defendant. As indicated in the charge, a street car company has a preferential right of way over its

own tracks, which all persons, under ordinary conditions, must respect. In case of wilful obstructions or hindrances, the law provides a remedy. At the same time, the streets occupied by tracks are open to all proper uses of the people, who are frequently compelled to cross, or to briefly occupy, the tracks in going to and from their homes and about their daily business. The railway company has no exclusive right to the use of the parts of the streets occupied by its tracks. Railway and people alike must exercise their respective rights with due regard to the rights of each other. They must exercise reasonable care, under the circumstances of each particular case. *Eckington & S. H. R. Co.* v. *Hunter,* 6 App. D. C. 287–310; *City & Suburban R. Co.* v. *Cooper,* 32 App. D. C. 550; *Mertz* v. *Detroit Electric R. Co.* 125 Mich. 11–14, 83 N. W. 1036; *Oates* v. *Metropolitan Street R. Co.* 168 Mo. 535, 58 L.R.A. 447, 68 S. W. 906; *Marden* v. *Portsmouth, K. & Y. Street R. Co.* 100 Me. 41–45, 69 L.R.A. 300, 109 Am. St. Rep. 476, 60 Atl. 530; *Baldie* v. *Tacoma R. & P. Co.* 52 Wash. 75, 100 Pac. 162; *United R. & Electric Co.* v. *Watkins,* 102 Md. 264–267, 62 Atl. 234. The special instruction asked by the defendant asserted an exclusive right in the railway company, and ignored the fact that its use of its right of way was limited by the speed regulation.

6. The last assignment of error that we think important to separately consider is on exceptions taken to the refusal of defendant's ninth special instruction. It was, substantially, that if a person be seen upon the track of a street railway, who is apparently aware of the approach of a car thereon, and who is also apparently capable of taking care of himself, the car operator has the right to assume that such person will leave the track before the car reaches him, and this presumption may be indulged so long as the danger of injuring him does not become imminent; and it is not necessary to diminish the speed of the car until such danger becomes imminent. Instead, the court charged the jury as follows:

"There are some other principles that I am asked to call to your attention. I said to you that the decedent had a right,

unless there was something to call his attention to the contrary, to assume that the car was moving at the lawful rate of speed or within it. In the same way it was the right of the motorman to assume, until there was something to call his attention to the contrary, that this man, if he saw him there, would act as a sober and prudent man would act. If he saw him right beside the track, and saw that he saw the car coming, he had the right to assume that he would not cross the track immediately in front of the car when the car was right upon him, or when there was great danger of his being struck by it. If the man apparently looked up and saw the car, so that the motorman, as a reasonable and prudent man naturally thought and did think that he saw the danger, saw that the car was coming right along, the motorman had a right to assume that he would not try to cross. But if he saw that he was about to cross in spite of that, no matter how careless he was in doing so, then it was his duty to do all that he could to save that man's life by the use of any reasonable means within his power."

This substituted charge contains all, and possibly more than the defendant was entitled to have given the jury. It may be granted that when a street car is moving within the lawful speed limit, the operator may reasonably assume that persons on or near the track, under the conditions stated in the refused instructions, will get out of the way, but as in crowded streets, amid other diversions, there is danger of running over persons who may be more or less negligent of their safety, it is the duty of the operator to have his car under ready control so that it may be readily stopped when the danger is found to be imminent. *New Jersey Electric R. Co.* v. *Miller,* 59 N. J. L. 423–425, 36 Atl. 885, 39 Atl. 645; *McDermott* v. *Severe,* 25 App. D. C. 276–287, and cases there cited. In the last case cited it is true that the parties on the track were children, but the principle that requires the car to be under proper control is one of general application. Even if the principle contained in the refused instruction were a sound one, it could have no application to a case where the car was being run at a rate of speed prohibited by law. That it was so running was found

by the jury, because they had been charged that unless they so found the plaintiff could not recover at all. Instead of "drifting" down a steep grade in a main thoroughfare, with his brakes off, the operator should have restrained his car within the lawful rate whether anyone could be seen on the track, or not; and, for a stronger reason, he should have reduced his speed when he saw a person about to cross the track, who might have had ample time to do so in safety had the speed not been greater than the law permitted.

While we have not discussed each and every assignment of error, there is none that has not been considered.

We find no error in the giving or refusing of instructions to the jury, and the judgment, will therefore be affirmed, with costs.                                    *Affirmed.*